IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| SHORT CREEK DEVELOPMENT, LLC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 22-05021-CV-SW-WBG |
| MFA INCORPORATED, | ) ) ) | |
| Defendant. | ) | |

ORDER AND OPINION (1) DENYING WITHOUT PREJUDICE PLAINTIFF'S
MOTION FOR PERMANENT INJUNCTION, (2) DENYING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT, AND (3) GRANTING IN PART AND
DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending are Plaintiff Short Creek Development, LLC's Motion for Permanent Injunction

(Doc. 57), Plaintiffs Short Creek Development, LLC and Short Creek Advisors, LLC's Motion for

Summary Judgment Respecting Defendant's Second Affirmative Defense (Doc. 59), and

Defendant MFA Incorporated's Motion for Partial Summary Judgment (Doc. 60). For the reasons

set forth below, Plaintiff's Motion for Permanent Injunction is **DENIED WITHOUT**

**PREJUDICE**, Plaintiffs' Motion for Partial Summary Judgment is **DENIED**, and Defendant's

Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND[1]

In 1953 and 1954, Missouri Farmers Association, Inc. purchased three parcels of land

located at 420 South Malang Road in Joplin, Missouri (hereinafter, "the Site"). On a portion of

---

[1] Unless otherwise noted, the background section contains facts that are uncontroverted and supported by evidence
that can be presented in a form that would be admissible in evidence, or the facts were not properly controverted by
the non-moving party. Citations to the parties' briefing and exhibits are provided when necessary. When citing the
record, the Court utilizes the pagination CM/ECF automatically applied to the parties' filings. Any statement in this
section should not be construed as a factual finding by the Court.

the land, a fertilizer plant ("plant") was constructed. The plant was designed to produce approximately 70,000 tons of fertilizer annually. Defendant MFA Incorporated ("MFA"), a wholly member-owned cooperative, owned and operated the plant.[2]

The plant's manufacturing process involved phosphoric acid. To make phosphoric acid, sulfuric acid and phosphate rock were used. Phosphogypsum, whose constituencies include phosphorous and fluoride, is a byproduct of producing phosphoric acid.[3] During MFA's ownership, the plant generated an estimated 157,000 to 224,000 tons of phosphogypsum.[4] The phosphogypsum was placed on a portion of the land south to southeast of the plant (hereinafter, "gypstack").

On April 1, 1957, Farmers Chemical Company ("FCC") took over ownership and operation of the plant. FCC was created pursuant to an agreement between MFA and Consumer Cooperative Association ("CCA"). Per the agreement, MFA owned sixty percent and CCA owned forty percent of FCC. MFA assumed all liabilities and agreed to indemnify CCA and FCC for claims connected to the plant's operation prior to April 1, 1957. In 1959, CCA became FCC's majority owner.

In 1962, the plant expanded, and production capability increased from 70,000 to more than 150,000 tons of fertilizer annually. In 1970, CCA, which changed its name to Farmland Industries,

---

[2] Missouri Farmers Association, Inc.'s relationship to Defendant MFA Incorporated is unclear. MFA's motion states Missouri Farmers Association, Inc. purchased the property and constructed a fertilizer plant, and Defendant MFA Incorporated owned and operated the plant and manufactured the fertilizer. Doc. 61 at 2-3. These facts were uncontroverted by Plaintiffs. Doc. 67 at 4-5. No additional facts explain the relationship between the entities. Regardless, any distinction between the entities is irrelevant to the Court's analysis of the pending motions.

[3] The parties stipulate "[p]hosphorus and fluoride were released . . . as constituencies of the phosphogypsum." Doc. 64 at 3. But they otherwise seem to disagree about what phosphogypsum contains. *See, e.g.*, Doc. 67 at 8-9; Doc. 73 at 2-3. The Court observes "phosphogypsum contains radioactive uranium and other metals that the EPA considers to pose a risk to humans and the environment." *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1294 (11th Cir. 2019); *see also Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of Interior*, No. 4:10-CV-004-BLW, 2011 WL 1743656, at *1 (D. Idaho May 3, 2011) ("The phosphogypsum is primarily gypsum and phosphorus, and includes contaminates such as arsenic, low-level radionuclides, selenium, zinc, cadmium, vanadium, fluoride, sodium, potassium, chloride, nitrates, ammonia, and sulfate.").

[4] During MFA's ownership, the plant did not operate the entire time. During 1955, the plant's operation ceased for two to four months due to a labor strike impacting the ability to obtain phosphate rock.

Inc. ("Farmland"), became FCC's sole owner. In December 1971, the plant ceased production of phosphoric acid. Between April 1957 and December 1971, FCC produced approximately 2,540,000 to 2,957,000 tons of phosphogypsum, which was placed on the gypstack. According to the parties, the gypstack contains approximately 2,700,000 tons of phosphogypsum.

In 1999, FCC merged with and into Farmland (formerly known as CCA). Per the merger agreement, Farmland continued as the surviving corporation and agreed to assume FCC's debts, liabilities, and obligations. In 2002, Farmland filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Missouri. *In re Farmland Indus.*, No. 02-50557-jwv11 (Bankr. W.D. Mo. 2002). In 2003, the Bankruptcy Court confirmed Farmland's Chapter 11 Plan. *Id*. (Dec. 19, 2003) (Doc. 7361).

In 2021, Plaintiff Short Creek Developmen,t LLC ("SCD") purchased the Site for $1.00 from FI Missouri Remediation Trust ("Trust"), which was formed as a Qualified Settlement Fund pursuant to Farmland's Chapter 11 Plan. The Trust assigned its right, title, and interest in the Site to Plaintiff Short Creek Advisors, LLC ("SCA"). Since it purchased the Site, SCD has incurred costs in responding to, among other things, the release of phosphogypsum.

In March 2022, Plaintiffs SCD and SCA filed this lawsuit against MFA. Doc. 1. They seek relief under the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, and further amended by the Hazardous and Solid Waste Amendments of 1984 ("RCRA"); and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). Doc. 1 at 1-2, 11-16.

Now pending are the parties' cross motions for summary judgment on MFA's second affirmative defense.[5]  Docs. 59-60.  Specifically, Plaintiffs ask the Court to declare MFA jointly and severally liable for response costs associated with the Site.[6]  Doc. 59.  MFA asks the Court to find liability is divisible among the responsible parties.  Docs. 60.  In addition, MFA seeks summary judgment as to when any accrual of prejudgment interest begins.  *Id*.  Also pending is SCD's motion for permanent injunction.  Docs. 57.  Both parties filed their respective responses and replies to the motions, which are now fully briefed.  *See* Docs. 67-73.  The Court first addresses the summary judgment motions and then turns to the motion for permanent injunction.[7]

## II.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (citations omitted).  To support its assertion that no genuine dispute of material fact exists, the movant must cite "to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1), (3)-(4); L.R. 56.1(a), (d).  In response, the nonmovant must set forth facts demonstrating a genuine issue for trial; showing the movant's cited materials "do not establish the absence . . . of a genuine dispute" or the movant "cannot produce admissible evidence to support

---

[5] MFA's affirmative defense asserts the following: "To the extent that any contamination is attributable to MFA, such contamination is divisible from other contamination at the Site, and MFA is not liable for costs relating to the other contamination."  Doc. 29 at 17.

[6] Plaintiffs' summary judgment motion seeks relief solely with regard to MFA's second affirmative defense.  *See* Doc. 59.  The Court notes Plaintiffs' claim under 42 U.S.C. § 9613(g)(2)(B) seeks relief similar to what MFA requests in its affirmative defense.  *See* Doc. 1 at 15 (seeking declaratory judgment pursuant to 42 U.S.C. § 9613(g)(2)(B) that "MFA is jointly and severally liable" for all future response costs).  Plaintiffs, however, do not seek summary judgment on this claim.  *See* Doc. 59; *see also* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought.").

[7] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned's jurisdiction.  Doc. 19.

the fact"; and/or objecting "that the material cited . . . cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(1)-(2); *see also* Fed. R. Civ. P. 56(c)(3)-(4), (e); L.R. 56.1(b)-(d). Whether asserting or contesting a fact, a party must cite evidence that could be presented in an admissible form at trial. Fed. R. Civ. P. 56(c)(2); *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) (citations omitted).

When considering a summary judgment motion, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmovant. *See Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). The Court is not permitted to make credibility determinations or weigh evidence. *Id.* If the record "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Lissick v. Andersen Corp.*, 996 F.3d 876, 882 (8th Cir. 2021) (citation omitted).

## B.    Prejudgment Interest

MFA moves for summary judgment with respect to the date on which any prejudgment interest begins to accrue. Doc. 60; Doc. 61 at 16-17. MFA argues prejudgment interest, if awarded, should begin to accrue on October 8, 2021 – when Plaintiffs served a pre-filing written demand. Doc. 61 at 16-17. In response to MFA's motion, Plaintiffs concede any prejudgment interest begins to accrue on October 8, 2021. Doc. 67 at 19. Accordingly, the Court **GRANTS** MFA's motion for summary judgment as to date on which prejudgment interest begins to accrue.

## C.    Divisibility of Harm

CERCLA "authorizes the federal government to respond to any threatened or actual release of any hazardous substance that may pose an imminent and substantial public health threat." *United States v. Hercules, Inc.*, 247 F.3d 706, 715 (8th Cir. 2001) (citing 42 U.S.C. § 9604). Response costs are initially paid by the Hazardous Substance Superfund, a multi-million-dollar

fund financed by appropriations, United States Environmental Protection Agency fees, and industry taxes. *See* 26 U.S.C. § 9507; 42 U.S.C. § 9611. If a private party incurs "necessary costs" in responding to the release or threatened release of a hazardous substance, CERCLA provides for the subsequent recovery of the costs from all parties responsible for the release or threatened release. 42 U.S.C. §§ 9607(a)(2), 9607(a)(4)(B). To establish liability under CERCLA, a plaintiff must show (1) the defendant is a "facility," (2) a "release or "threatened release" of a "hazardous substance" from the defendant occurred, (3) the release or threatened release caused the plaintiff to incur response costs, and (4) the defendant falls within one of four classes of responsible persons. *United States v. Aceto Agr. Chems. Corp.*, 872 F.2d 1373, 1378-79 (8th Cir. 1989) (citations omitted).

For purposes of the pending summary judgment motions, the parties stipulate the Site is a facility, there has been a release or threatened release of a hazardous substance at the Site, SCD incurred response costs, and MFA falls within a class of responsible persons. Doc. 64 at 1-3. Plaintiffs do not seek summary judgment in its favor on whether MFA is liable under CERCLA. *See* Doc. 59.[8] Instead, both parties seek summary judgment on MFA's divisibility of harm defense. *See* Docs. 59-60. Plaintiffs argue MFA is jointly and severally liable for all response costs associated with the Site, while MFA contends liability is apportionable. *See id*.

Ordinarily, liability under CERCLA is joint and several. *See United States v. Dico*, 920 F.3d 1174, 1181 (8th Cir. 2019) (citation omitted). An exception to this general rule is when the environmental harm at the site is shown to be divisible. *Hercules*, 247 F.3d at 716-17; *see also*

---

[8] Although Plaintiffs' briefing states MFA has "stipulated to liability under CERCLA § 107(a)" (Doc. 70 at 7; Doc. 67 at 17), their motion does not seek summary judgment on the section 107(a) claim. *See* Doc. 59.

*United States v. Capital Tax Corp.*, 545 F.3d 525, 534-35 (7th Cir. 2008).[9]   Whether the environmental harm can be divided is a question of law; however, the court's decision rests on findings of fact.  *Hercules*, 247 F.3d at 718; *United States v. NCR Corp.*, 688 F.3d 833, 838 (7th Cir. 2012) (observing the court will need to consider, among other things, "what type of pollution is at issue, who contributed to that pollution, how the pollutant presents itself in the environment after discharge, and similar questions.").  When harm is incapable of division, the court may "not make an arbitrary apportionment."  *United States v. Vertac Chem. Corp.*, 453 F.3d 1031, 1040 (8th Cir. 2006) (citation omitted).  If the court determines the environmental harm is capable of being divided, "the actual apportionment of damages is a question of fact."  *Hercules*, 247 F.3d at 718.

A defendant seeking to avoid joint and several liability must show by a preponderance of the evidence that "a reasonable basis for determining the contribution of each cause to a single harm."[10]  *Id*. at 717 (citations omitted); *see also Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009) (quoting Restatement (Second) of Torts § 433A(1)(b) (Am. L. Inst. 1963-64)).  "Evidence supporting divisibility must be concrete and specific."  *Hercules*, 247 F.3d at 718.  Proving divisibility of harm is intensely factual.  *See ASARCO, LLC v. Union Pac. R.R. Co.*, 762 F.3d 744, 747 (8th Cir. 2014) (citation omitted); *see also United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 811 (S.D. Ohio 1983).[11]  And, as the Eighth Circuit Court of Appeals has

---

[9] Divisibility of harm differs from contribution or allocation of damages.  "Contribution . . . is concerned only with the distribution of CERCLA liability." *Territory of Guam v. United States*, 141 S. Ct. 1608, 1612 (2021).  It "is a tool for apportioning the burdens of a predicate 'common liability' among the responsible parties." *Id*. at 1612-13 (citation omitted).  "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1); *see also United States v. Hercules*, 247 F.3d 706, 718 (8th Cir. 2001) (citation omitted) (observing the divisibility doctrine "is conceptually distinct from contribution or allocation of damages, and that allocation involves "the extent to which a defendant's liability may be offset by the liability of another").  Unlike contribution, "[e]quitable considerations play no role in the apportionment analysis." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 615 n.9 (2009).

[10] Alternatively, a defendant may show distinct harms to avoid joint and several liability.  *See Hercules*, 247 F.3d at 718.  MFA, however, does not argue distinct harms.  *See* Doc. 61 at 9-16.

[11] The Supreme Court hailed *Chem-Dyne Corp.* as "[t]he seminal opinion on the subject of apportionment in CERCLA actions." *Burlington N.*, 556 U.S. at 613.

observed, "proving divisibility is a 'very difficult proposition.'" *Hercules*, 247 F.3d at 717

(quoting *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 934 n.4 (8th Cir. 2001)).

When determining whether divisibility is appropriate, "the nature of the harm is the key

factor." *In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 896 (5th Cir. 1993); *see also Pakootas v.*

*Teck Cominco Metals, Ltd.*, 905 F.3d 565, 591 (9th Cir. 2018). The "harm" is "the entirety of

contamination at a site that has caused or foreseeably could cause a party to incur response costs,

suffer natural resource damages, or sustain other types of damages cognizable under section

107(a)(4)." *Pakootas*, 905 F.3d at 592 (citations omitted); *see also Burlington N.*, 556 U.S. at 616

(referring to the harm as "the overall site contamination requiring remediation."). Significantly

and relevant to this matter, the commingling of pollutants is not synonymous with indivisible harm,

but it creates "a rebuttable presumption of such harm." *Pakootas*, 905 F.3d at 592-93; *United*

*States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir. 1993). Depending on the particular

facts and circumstances in a case, divisibility of harm may be proved by volumetric, chemical,

geographic, chronological, or other types of evidence. *See Vertac Chem. Corp.*, 453 F.3d at 1040;

*Hercules*, 247 F.3d at 719 (citations omitted).

It is undisputed MFA generated phosphogypsum and placed it on the gypstack, after which

FCC produced phosphogypsum and placed it on the same gypstack. Doc. 61 at 3; Doc. 64 at 2;

Doc. 67 at 5, 7. The environmental harm, as best the Court discerns, is the gypstack leachate.[12]

Doc. 67 at 4, 14-19; Doc. 70 at 1-2, 5-8.[13] MFA argues divisibility of the environmental harm

---

[12] The Court is unable to locate a definition of "leachate" in the parties' briefing. The United States Environmental Protection Agency defines leachate as "any liquid, including any suspended components in the liquid, that has percolated through or drained from hazardous waste." 40 C.F.R. § 260.10 (2020).

[13] Neither summary judgment motion clearly identifies the environmental harm. *See* Docs. 59-1, 61. Nevertheless, the parties agree Plaintiffs' response to the gypstack "is a leachate management issue." Doc. 68 at 7; Doc. 70 at 5.

may be based on the amount of time each entity operated the plant and the estimated amount of phosphogypsum each entity placed on the gypstack.  Doc. 61 at 12-16.

### (1)     Chronological Divisibility

MFA contends chronological evidence supports divisibility of harm.  Doc. 61 at 13, 15-16. It maintains the Court should analyze the time each entity operated the plant.  *Id*.  Based on the record, MFA "operated" the plant between November 1954 and March 1957 "or 29 months."  *Id*. at 13.  FCC operated the plant between April 1957 and December 1971 "or 177 months."  *Id*. Between the two entities, the plant operated 206 months.  *Id*. at 13 n.10.  Consequently, MFA, which operated the plant twenty-nine of the 206 months, advances it is responsible for "approximately 14% of the phosphogypsum generated."  *Id*. at 13.

MFA's chronological divisibility argument does not seem to address the proportion of environmental harm caused by the amount of phosphogypsum each entity placed on the gypstack. This may be significant since the plant's production more than doubled while FCC operated the plant.  Additionally, it does not appear MFA's argument accounts for the timeframe during which each entity placed phosphogypsum on the gypstack.  Notably, MFA's expert opines phosphogypsum's impact on the environment decreases over time.  *See* Doc. 61-10 at 22-23, 26. Thus, because MFA placed phosphogypsum on the gypstack before FCC did, MFA's contribution to the environmental harm may be less.

Based on the record before it, the Court concludes summary judgment is not proper. Although divisibility is generally deemed a question of law, the underlying considerations of the divisibility doctrine require further development of facts, including the amount, timing, and age of the phosphogypsum generated by MFA and FCC, and the resulting environmental harm.

### (2)     Volumetric Divisibility

MFA also argues causation of environmental harm may be apportioned volumetrically. Doc. 61 at 12.  In support, MFA cites the report of its expert, Matthew Pasek, Ph.D.  *Id*. at 12-14. Dr. Pasek opines MFA produced roughly 157,000 to 224,00 tons of phosphogypsum, and FCC generated 2,543,000 tons of phosphogypsum.  Doc. 61-10 at 7, 14-15.  These estimations, which are the bases of MFA's argument, are discussed below.

### (a)     MFA

During the first six months of operation (January 1955 to June 1955), Dr. Pasek estimates MFA generated between 17,000 and 21,000 tons of phosphogypsum.  Doc. 61-10 at 7.  His calculation is based on the amount of phosphorus pentoxide produced.  *Id*.[14]  Between July 1955 and June 1956, Dr. Pasek submits MFA produced between 56,000 and 104,000 tons of phosphogypsum.  *Id*. at 8.  These figures are derived from the amount of phosphate fertilizer sold (38,000 tons) and the presumed phosphorus pentoxide content of the fertilizer sold.  *Id*. at 7-8.

From July 1956 to March 1957, Dr. Pasek calculates MFA generated 84,000 to 99,000 tons of phosphogypsum.  *Id*. at 8-9.  Because the amount of fertilizer made or sold is unavailable, Dr. Pasek uses sulfuric acid consumption to determine the amount of phosphogypsum produced.  *Id*. Based on the amount of sulfuric acid consumed and the assumption the plant's production rate was 85%,[15] Dr. Pasek computes roughly 84,000 tons of phosphogypsum were generated between July 1956 and March 1957.  *Id*. at 9.  If the plant was running at full capacity, Dr. Pasek calculates 99,000 tons of phosphogypsum were produced between July 1956 and March 1957.  *Id*.

---

[14] In his report, Dr. Pasek indicates his opinions are based on information in MFA documents.  *See* Doc. 61-10 at 7-9. The record does not appear to include most of those documents.  Thus, it is unclear if the documents on which Dr. Pasek relies provide the amounts he references or if he extrapolates the amounts from information in the documents.

[15] To account for "equipment downtime, phosphate mining strikes in 1959, 1965, and 1969, and production slow-downs in the 1970s," Dr. Pasek assumes the plant's production capacity was 85%.  Doc. 61-10 at 14.

**(b)** **FCC**

From the time FCC began operating the plant in April 1957 through November 1962, Dr. Pasek opines 112,000 and 130,000 tons of phosphogypsum were generated annually. Doc. 61-10 at 14. Between December 1962 and December 1971, he estimates the plant produced 209,000 to 245,000 tons of phosphogypsum each year. *Id.* His calculations are based on the amount of sulfuric acid "provided to the plant,"[16] whether the plant was operating at an 85%[17] or 100% production rate, and the plant's capacity doubling in 1962. *Id.*

To summarize, Dr. Pasek estimates the amount of phosphogypsum produced by MFA and FCC based on the amount of phosphorus pentoxide produced, amount of phosphate fertilizer sold, presumed phosphorus pentoxide content of the fertilizer, consumption of sulfuric acid, and/or an assumption that the plant's production rate was 85% or 100%. Because MFA "generated approximately 200,000[18] tons of phosphogypsum . . . with 225,000 being the upper estimate," Dr. Pasek opines MFA's contribution to the harm is between six and eight percent. *Id.* at 26.

Based on the foregoing opinions and calculations, MFA contends volumetric evidence is a reasonable basis for divisibility of harm. Doc. 61 at 12-14. It claims its "liability in relation to the Gypstack is 6% compared to FCC's 94%." *Id.* Plaintiffs, however, contend volumetric divisibility is not a reasonable basis for divisibility of harm. *See* Doc. 67 at 11-19.

---

[16] Dr. Pasek states his estimation is based on the "consumption" of sulfuric acid. Doc. 61-10 at 14. But his report refers to the amount of sulfuric acid "provided" to the plant. *Id.* Thus, it is unclear if the amount of sulfuric acid provided is the same as the amount that was consumed.

[17] *See supra*, n.15.

[18] Only in his conclusion does Dr. Pasek opine MFA generated between 200,000 tons and 225,000 tons of phosphogypsum. Doc. 61-10 at 26. In all other instances in his report, Dr. Pasek attributes between 157,000 tons and 224,000 tons of phosphogypsum to MFA. *Id.* at 7, 14. There is no explanation as to why the amounts differ.

11

### (c)    Whether the Environmental Harm Can Be Divided Volumetrically

Volumetric contributions may provide a reasonable basis for divisibility of harm but "only if it can be reasonably assumed, or it has been demonstrated, that independent factors had no substantial effect on the harm to the environment." *United States v. Monsanto Co.*, 858 F.2d 160, 173 n.27 (4th Cir. 1988) (citation omitted); *see also Pakootas*, 905 F.3d at 593 (observing "physical aggregation can cause disproportionate harm that is not linearly correlated with the amount of pollution attributable to each source."). In addition, the proponent of volumetric divisibility must show "a relationship between waste volume, the release of hazardous substances, and the harm at the site." *Monsanto*, 858 F.2d at 172; *see also Pakootas*, 905 F.3d at 595. Also relevant to establishing divisibility of harm is "evidence disclosing the relative toxicity, migratory potential, and synergistic capacity of the hazardous substances at the site." *Monsanto*, 858 F.2d at 172 n.26; *see also Pakootas*, 905 F.3d at 595; *Alcan Aluminum Corp.*, 990 F.2d at 722; *United States v. Agway, Inc.*, 193 F. Supp. 2d 545, 552 (N.D.N.Y. 2002).

As discussed *supra*, section II(C)(2), MFA provides estimated amounts of phosphogypsum it and FCC generated. Based on its expert's calculations, MFA argues there is a reasonable basis to apportion the environmental harm caused by the gypstack. Plaintiffs contend the volume of phosphogypsum generated by each entity is not a factor for divisibility. To support their position, they rely on their expert, Adam H. Love, Ph.D. According to Dr. Love, "The environmental impacts would have resulted from either operator's waste disposal, therefore the relative contribution of mass or volume does not apply to the divisibility of the harm." Doc. 59-2 at 21. He maintains no mass or volume technical approach is appropriate for dividing the phosphogypsum waste contributions and associated harm. *Id*.

Based on the record presented, the Court is unable to determine at the summary judgment stage if the environmental harm caused by the gypstack is capable of being divided because there

are facts in dispute, including but not limited to competing expert opinions and whether the timing and/or volume of phosphogypsum result in divisible environmental harms. *See Alcan*, 990 F.2d at 722-23 (finding "differing contentions supported by expert affidavits raise sufficient questions of fact to preclude the granting of summary judgment on the divisibility issue."). Additionally, summary judgment is not proper in this case where the factual record is not fully developed concerning certain aspects of the phosphogypsum generated by each entity, including the relative toxicity, interaction with other substances at the Site, migratory potential, and decay.

The Court is aware there only needs to be a reasonable basis for determining each entity's contribution to the environmental harm, but the Court must consider the nature of the harm itself, which was caused by the commingling of volumes of pollutants and the entirety of the Site's contamination. Although divisibility is generally deemed a question of law, the underlying considerations of the divisibility doctrine are uniquely factual in nature, including the amount and timing of the phosphogypsum generated, the resulting environmental harm, and the impact of phosphogypsum's age on the environmental harm. The Court finds neither Plaintiffs nor MFA, which each move for summary judgment, has met the burden of demonstrating the absence of a genuine issue of fact as to whether or not the environmental harm is capable of apportionment. Accordingly, the Court **DENIES** MFA's motion for summary judgment and **DENIES** SCD and SCA's motion for summary judgment.

## III.    MOTION FOR PERMANENT INJUNCTION

Also pending is SCD's Motion for Permanent Injunction. Doc. 57. Therein, SCD asks the Court to enter an extensive (51-page) permanent injunction (Doc. 57-7) requiring MFA "to immediately address . . . [its] past, present and ongoing discharge and disposal of solid waste which has resulted in an imminent and substantial endangerment to health or the environment." Doc. 57 at 4. A plaintiff seeking a permanent injunction must show (1) "actual success on the merits," (2)

"it faces irreparable harm," (3) "the harm to it outweighs any possible harm to others," and (4) "an injunction serves the public interest." *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1012 (8th Cir. 2011) (citation omitted).[19]

SCD argues "MFA's liability is certain" under the Resource Conservation and Recovery Act of 1976 ("RCRA").  Doc. 57-1 at 12.  This argument, however, is insufficient to support a motion for permanent injunction.  SCD must "show actual success on the merits."  *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008).  The Court has not issued a ruling on the merits of SCD's claims.  Without a decision finding SCD has succeeded on its claims, it is premature for the Court to consider a motion for permanent injunction.  Accordingly, the Court **DENIES WITHOUT PREJUDICE** SCD's Motion for Permanent Injunction.

## IV.     CONCLUSION

Based on the foregoing reasons, the Court **DENIES WITHOUT PREJUDICE** Plaintiff SCD's Motion for Permanent Injunction, **DENIES** Plaintiffs SCD and SCA's Motion for Summary Judgment Respecting Defendant's Second Affirmative Defense, and **GRANTS IN PART** and **DENIES IN PART** MFA's Motion for Partial Summary Judgment.

**IT IS SO ORDERED.**

DATE: August 4, 2023                     */s/ W. Brian Gaddy*
                                         W. BRIAN GADDY
                                         UNITED STATES MAGISTRATE JUDGE

---

[19] SCD concedes it must establish these four elements.  *See* Doc. 57-1 at 7.