## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| **SHORT CREEK DEVELOPMENT,** | ) | |
| **LLC, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **No. 22-05021-CV-SW-WBG** |
| | ) | |
| **MFA INCORPORATED,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

On December 11 and December 13, 2023, the Court conducted a bench trial on the issue of allocation of damages related to Plaintiffs' claim under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9607(a) ("CERCLA"). Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and based on the evidence and arguments presented, the Court makes the following findings of fact and conclusions of law. Judgment is entered in Defendant's favor.

## I.     BACKGROUND AND PRIOR FINDINGS OF FACT[1]

### A.     MFA

Missouri Farmers Association, Inc., now known as Defendant MFA Incorporated (collectively, "MFA"), purchased land near Joplin, Missouri in 1953 and 1954 and constructed a fertilizer plant ("the Plant"). The Plant used, among other things, phosphoric acid to manufacture the fertilizer. To make phosphoric acid, the Plant utilized sulfuric acid and phosphate rock.

---

[1] The Court's prior Orders provide a more thorough background discussion. *See* Docs. 75, 118. The Court summarizes the background facts and prior findings of fact relevant to this Order.

Phosphogypsum, a byproduct from the process of making phosphoric acid, was first produced at the Plant in January 1955.

MFA operated the Plant through March 31, 1957. During that time, approximately 157,000 to 224,000 tons of phosphogypsum were produced. The phosphogypsum was placed in an area to the south-southeast of the Plant, forming a gypstack.

**B.     FCC**

On April 1, 1957, Farmers Chemical Company ("FCC") became the Plant's owner and operator. FCC was formed pursuant to an agreement between MFA and Consumer Cooperative Association ("CCA"). The agreement provided for, *inter alia*, (1) FCC's creation, (2) joint ownership of FCC by MFA (60%) and CCA (40%), (3) MFA's sale of 300+ acres to FCC, (4) MFA's sale of assets to CCA, and (5) MFA's indemnification of CCA and FCC against all claims, costs, and expenses connected with the Plant's operation before April 1, 1957.

In 1959, CCA became FCC's majority owner. Between March 1962 and October 1962, the Plant expanded its production capability, exceeding 150,000 tons of fertilizer annually. In 1966, CCA became Farmland Industries, Inc. ("Farmland"), and in 1970, Farmland became FCC's sole owner.

Between April 1957 and December 1971, the Plant generated between roughly 2,540,000 and 2,957,000 tons of phosphogypsum, which were placed on the gypstack. In December 1971, phosphoric acid production ceased. No phosphogypsum was placed on the gypstack after December 1971. The gypstack covers approximately 54 acres and varies in depth from a few feet to 60 feet.

### C.      Phosphogypsum

Phosphogypsum primarily consists of gypsum and phosphate.  It also contains, *inter alia*, phosphorus, fluoride, arsenic, low-level radionuclides, selenium, zinc, cadmium, sodium, potassium, chloride, ammonia, sulfate, sulfuric acid, phosphoric acid, and hydrofluoric acid. When precipitation falls, the water percolates through and around the gypstack, drawing out its components.  The resulting liquid is called leachate.  The leachate is the environmental harm in this matter.  Doc. 125 at 51.[2]

### D.      The Merger and Farmland's Bankruptcy

In 1999, FCC merged with Farmland.  In 2002, Farmland filed a voluntary petition for protection under Chapter 11 of the United States Bankruptcy Code.  *In re Farmland Indus.*, No. 02-50557-jwv11 (Bankr. W.D. Mo. 2002).  In 2003, the Bankruptcy Court confirmed Farmland's Second Amended Joint Plan of Reorganization ("Plan").[3]  Pursuant to the Plan and section 468(b) of the Internal Revenue Code, FI Missouri Remediation Trust ("FIMRT") was formed as a Qualified Settlement Fund to, *inter alia*, remediate the leachate emanating from the gypstack. FIMRT's initial corpus included title to the land containing the gypstack (hereinafter, "Gypstack Site") and $5,509,808.  During the damages trial in December 2023, additional evidence about FIMRT's formation was presented.  Accordingly, the Court discusses FIMRT in more detail in this Order's findings of fact.  *See infra*, section III(C).

### E.      Short Creek Development, LLC and Short Creek Advisors, LLC

In September 2021, Plaintiff Short Creek Development, LLC ("SCD") purchased the Gypstack Site from FIMRT for $1.00.  When it purchased the Gypstack Site, SCD assumed the

---

[2] Regarding Court filings, the Court refers to the page numbers applied by CM/ECF.

[3] Contemporaneously, Farmland's corporate existence terminated.

Gypstack Site's environmental liabilities and agreed to pay all administrative expenses associated with the Gypstack Site. FIMRT also assigned its claims to Plaintiff Short Creek Advisors, LLC ("SCA"). Thus, SCA is the holder of all right, title, and interest in the Gypstack Site.

## II. PROCEDURAL HISTORY

On March 28, 2022, SCD and SCA sued MFA seeking (1) abatement of imminent and substantial endangerment pursuant to section 7002(a)(1)(B) of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984 ("RCRA"); and (2) cost recovery and declaratory judgment under sections 107(a)(4)(B) and 113(g)(2) of CERCLA. Doc. 1. In March 2023, the parties filed cross-motions for summary judgment on MFA's CERCLA liability. Docs. 59-60.[4] In August 2023, the Court denied both parties' motions for summary judgment on the issue of whether the environmental harm is capable of apportionment. Doc. 75.

On October 2, 2023, the Court conducted a bench trial on the issue of divisibility of environmental harm. Docs. 102, 105. On October 26, 2023, the parties stipulated to the dismissal with prejudice of Plaintiffs' RCRA claims and SCD's request for a declaratory judgment under CERCLA. Doc. 107; *see also* Doc. 109. Thus, Plaintiffs' claim for recovery of costs under section 107(a) of CERCLA is the only remaining claim.[5] Doc. 1 at 4, 13-14. On December 6, 2023, the Court found there was no basis for divisibility of the environmental harm under CERCLA,

---

[4] MFA also sought summary judgment with regard to the date on which any prejudgment interest began to accrue. Doc. 60. Plaintiffs conceded any prejudgment interest began to accrue on October 8, 2021. Doc. 67 at 19. Thus, the Court granted MFA's motion on that issue. Doc. 75 at 5. During the same timeframe, SCD moved for a permanent injunction, which the Court denied without prejudice. Docs. 57, 75.

[5] Sections 107(a) and 113(f) of CERCLA "allow private parties to recover expenses associated with cleaning up contaminated sites." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 131 (2007). The remedies available under these sections "complement each other by providing causes of action 'to persons in different procedural circumstances.'" *Id.* at 139 (quoting *Consol. Edison Co. v. UGI Utils., Inc.*, 423 F.3d 90, 99 (2d Cir. 2005)). Relevant here, the Supreme Court has held a potentially responsible party ("PRP"), like Plaintiffs, may seek recovery of cleanup costs from other PRPs under section 107(a)(4)(B) of CERCLA. *Id.* at 139-41.

meaning MFA is jointly and severally liable to Plaintiffs under section 107(a) of CERCLA. Doc. 118 at 8-18.

On December 11 and 13, 2023, the Court conducted a bench trial on the allocation of damages. Docs. 120, 122, 125-26. After the trial, the Court asked the parties to provide briefing on several issues, including, but not limited to, the statute of limitations. Doc. 124. On January 26, 2024, both parties filed their post-trial briefs. Docs. 128-29.

After trial, the parties also filed a Joint Stipulation of Uncontroverted Facts. Doc. 127. Therein, they stipulate "MFA has reimbursed Plaintiffs for $75,495.01 in [Missouri Department of Natural Resources ("MDNR")]-approved response costs incurred between September 21, 2021 and June 30, 2023." *Id*. at 1. The parties also agree that, pursuant to a confidential settlement agreement, MFA shall reimburse Plaintiffs for a portion of future response costs approved by MDNR. *Id*. Finally, the parties inform the Court that "any calculation or allocation of past costs should not exceed June 30, 2023." *Id*. at 2. Consequently, only response costs incurred before June 30, 2023 are at issue before the Court. *See* Doc. 125 at 40, 123; Doc. 127 at 2.

### III.    FINDINGS OF FACT

#### A.    Mining Wastes Predating the Gypstack Site

Beginning in the mid-1800s, mining and milling practices in Jasper and Newton Counties contaminated surface soil, sediments, surface water, and groundwater with heavy metals. Pls.' Ex. 15 at 7-8[6]; Pls.' Ex. 21 at 5; Def.'s Ex. 61, Attach. 57 at 4.[7] Roughly 100 million tons of mining and milling wastes were created, and approximately ten million tons of mining and milling wastes

---

[6] Regarding Plaintiffs' exhibits, the Court refers to the pagination applied by Plaintiffs' counsel to the exhibits.

[7] With regard to Defendant's exhibits, the Court refers to the actual page(s) of the .pdf on which the information may be found.

remain. Doc. 125 at 65; Pls.' Ex. 21 at 5. The gypstack was placed on top of the mining and milling wastes. Doc. 118 at 2; *see also* Doc. 125 at 22, 25-26, 46, 65-66, 82.

The mining wastes are part of the Oronogo-Duenweg Mining Belt Superfund Site ("ODMB Site"). Doc. 125 at 65, 76, 83-84, 126; Pls.' Ex. 21 at 5. In 1990, the United States Environmental Protection Agency ("EPA") listed the ODMB Site on the National Priorities List ("NPL"), "a national list of Superfund sites that prioritizes cleanups in order of the most serious contamination problems and greatest threats to human health and the environment." Pls.' Ex. 15 at 8; *see also* 40 C.F.R. § 300.425(b). EPA is the lead agency of the ODMB Site. Doc. 125 at 76-77, 126.

In 1995, EPA, supported by MDNR, began conducting remedial actions within the ODMB Site. Pls.' Ex. 21 at 5. In September 2004, EPA issued a Record of Decision for the ODMB Site ("2004 ROD").[8] The 2004 ROD's primary purpose was documenting "the cleanup alternative selected by the EPA to address the metals contamination from past mining and milling operations at the site." Def.'s Ex. 61, Attach. 61 at 1, 7.

## B. Initial Permits for the Gypstack Site and Construction of a Water Treatment Plant

In 1995, MDNR, which is the lead agency for the Gypstack Site, issued a permit to Farmland regulating limitations for phosphorus and fluoride in the seepage and runoff water from the Gypstack Site. Doc. 125 at 126; Def.'s Ex. 61, Attach. 39. When issuing the permit, MDNR informed Farmland the permit was its "Federal Discharge Permit and [its] new State Operating Permit . . . ." Def.'s Ex. 61, Attach. 39 at 1. MDNR modified the permit in October 1995. *See* Def.'s Ex. 61, Attach. 11 at 2.

---

[8] A Record on Decision, or ROD, is "the last administrative action necessary for the EPA to choose . . . its official response action." *United States v. Knote*, 29 F.3d 1297, 1300 (8th Cir. 1994); *see also* 40 C.F.R. § 300.430(f)(4)-(5).

"[T]o plan and execute a site evaluation study and to prepare an engineering report that would propose a method to achieve the [National Pollutant Discharge Elimination System ("NPDES")] effluent limitations," Farmland retained Burns & McDonnell Waste Consultants, Inc. Def.'s Ex. 61, Attach. 11 at 2. In December 1996, Burns & McDonnell's report was provided to MDNR. *Id.*[9] The report provided "data collected during the site evaluation study" and "proposed measures for meeting the final effluent limits in the NPDES permit." *Id.* Burns & McDonnell recommended Farmland "collect the impacted water immediately upstream," "construct a chemical precipitation treatment plant to reduce phosphorous [sic] and fluoride levels in the water" and reroute Short Creek to "minimize the volume of water collected and treated." *Id.*

In 1998, MDNR approved "a modified NPDES compliance plan to achieve the NPDES effluent limitations." *See* Def.'s Ex. 61, Attach. 11 at 2. The modified plan "include[d] the following remedial measures": rerouting Short Creek, placing a water collection and pumping system, constructing a water treatment plant, and modifying the existing surface drainage to prevent surface water from entering the Gypstack Site. Def.'s Ex. 61, Attach. 11 at 2, 8-11. In 1999, MDNR approved Farmland's plans and specifications for construction of a water treatment plant. Def.'s Ex. 61, Attach. 19 at 226-28.

MDNR issued a modified permit that addressed "[s]eepage and runoff from waste phosphogypsum pile and storm water from plant site collected in Short Creek and pumped to chemical precipitation treatment plant where it is treated and discharged." Def.'s Ex. 61, Attach. 42 at 2. It provided effluent limitations for phosphorus and fluoride and included monitoring and

---

[9] The Court was unable to locate the December 1996 report in the parties' trial exhibits. However, the December 1996 report is discussed in an October 1998 report prepared by Burns & McDonnell on Farmland's behalf to "assemble basic information, present design criteria and assumptions, examine best alternatives, and provide order-of-magnitude-type cost estimates to implement the water collection, transfer and treatment parts of the project." Def.'s Ex. 61, Attach. 11 at 3.

reporting requirements. *Id.* at 4-9. MDNR again informed Farmland that the permit was its "federal discharge permit and [its] new state operating permit and replaces all previous state operating permits for this facility." *Id.* at 1.

Farmland constructed, *inter alia*, an interceptor trench, low water dam, 160 gallons per minute pumping system, water treatment plant with a 59,000-gallon tank, process wastewater lagoon, and a French drain. Def.'s Ex. 61, Attach. 11 at 8-11; Def.'s Ex. 61, Attach. 19 at 21, 33, 37-38, 40-41. It also constructed a 3,500-foot bypass line to reroute Short Creek. Def.'s Ex. 61, Attach. 18 at 21. In 2000, the water treatment plant at the Gypstack Site became operational. Doc. 126 at 14; Pls.' Ex. 23 at 7; Def.'s Ex. 61, Attach. 19 at 21. It removed phosphorus and fluoride from the leachate. Doc. 125 at 77-78; Def.'s Ex. 61, Attachs. 11, 42. But it was not designed to treat metals. Doc. 125 at 79. The water treatment plant continued operating until March 2012. Doc. 125 at 78-79.

In February 2001, Farmland completed a Phase I Environmental Assessment. Def.'s Ex. 61, Attach. 19.[10] Therein, Farmland stated it "has installed all necessary response actions mandated by the MDNR." *Id.* at 25. It also declared "[n]o further action is deemed necessary at this time related to the gypsum pile." *Id.*

## C. Formation of FIMRT

Pursuant to the Bankruptcy Court's approval of Farmland's reorganization plan, FIMRT was established. Def.'s Exs. 18, 21. In April 2004, a Trust Agreement creating FIMRT was executed by Farmland, Farmland Liquidating Trust, and SELS Administrative Services.[11] Def.'s

---

[10] This assessment was conducted "to meet Farmland's obligations under . . . the Credit Agreement . . . by and between Farmland and CoBank . . . ." Def.'s Ex. 61, Attach. 19 at 7. Its purpose "was to identify, to the extent possible, Recognized Environmental Conditions related to the Property . . . ." *Id.*

[11] Farmland and Farmland Liquidating Trust selected SELS Administrative Services to act as FIMRT's Trustee. Def.'s Ex. 18 at 2.

Ex. 18.[12]  FIMRT was established to "undertake certain remedial measures" and resolve "claims asserting environmental liability with respect to the Trust Sites" – i.e., the Gypstack Site and a building in North Kansas City, Missouri ("NKC building").[13]  *Id*. at 2, 5, 18.  FIMRT's purpose was three-fold: (1) "receive, hold and maintain custody of the Trust Fund from the Grantors[14] for the benefit of the Primary Beneficiary"[15]; (2) "receive, hold and maintain custody of the Trust Sites"; and (3) "maintain, remediate and monitor the Trust Sites in accordance with the Remediation Plan and any Environmental Laws prior to any sale of such properties . . . ."  *Id*. at 5.

Farmland funded FIMRT with a cash payment of $5,509,808 and transfer of the Trust Sites. *Id*. at 2, 5-6, 18.  Of the amount Farmland paid, $5,292,119 was allocated to the Gypstack Site, and the remaining $217,689 was allocated to the NKC building.  *Id*. at 18; Doc. 126 at 51.  Per the Trust Agreement, FIMRT was to use the funds "for the sole purpose of implementing the actions required by [MDNR] for remediation and monitoring of the Trust Sites."  Def.'s Ex. 18 at 7.[16]

When FIMRT was created, its administrative expenses were paid by Farmland Liquidating Trust until the second anniversary of the Trust Agreement's effective date.  *Id*. at 10.  At that time, Farmland Liquidating Trust was required to "contribute to the Trust cash or cash equivalents in an amount it reasonably believes, after consultation with the Trustee and the Beneficiaries, to be adequate to pay for the Administrative Expenses until the Trust is terminated . . . ."  *Id*. at 6.  In

---

[12] According to its Trust Administrator, FIMRT was created so Farmland could conclude its bankruptcy plan.  Doc. 126 at 50.  Farmland liquidated all assets except ten properties it was unable to sell due to environmental liabilities associated with the properties.  *Id*.  Farmland "found a liquidating trustee, which was JP Morgan, and JP Morgan was given some funds and the properties."  *Id*.  JP Morgan then created FIMRT to hold the title to the properties, manage environmental concerns, and "divest them eventually."  *Id*. at 50-51.

[13] The NKC building is not at issue in this lawsuit.

[14] Farmland and Farmland Liquidating Trust are the grantors.  Def.'s Ex. 18 at 2, 4.

[15] The primary beneficiary is MDNR.  Doc. 126 at 12-13; Def.'s Ex. 18 at 4.

[16] This case is significantly different than many reported CERCLA liability cases in that a potentially responsible party (i.e., Farmland and its predecessor entities) created a trust fund for the sole purpose of funding future environmental remediation and monitoring at the Gypstack Site.

April 2006, Farmland Liquidating Trust, as recommended by the Trustee, paid $1,882,560 to FIMRT to fund its administrative expenses. *See* Def.'s Ex. 61, Attach. 20 at 3-4.

**D. MDNR Instructs FIMRT to Investigate Other Solutions for Gypstack Site**

In September 2006, MDNR toured the water treatment plant and held a meeting with PCS Phosphate Company, which managed the water treatment plant, and Shaw Environmental, which FIMRT hired to prepare a work plan to relocate the water treatment plant. Pls.' Ex. 22 at 1; Def.'s Ex. 61, Attach. 50. In a letter sent after the meeting, MDNR informed FIMRT "[t]he need for a treatment plant to treat runoff from the gypsum pile is clear," but the "arrangement with PCS Phosphate Company to operate the [water treatment plant] needs to be revisited." Pls.' Ex. 22 at 1. MDNR noted FIMRT's latest proposed remedy "to build a more efficient treatment plant[ ] is well intentioned in seeking to maximize the use of the trust fund." *Id.* However, MDNR, as FIMRT's beneficiary, believed the proposed "remedy guarantees that the pile will continue to cause environmental damage long after the trust's resources are exhausted." *Id.*

MDNR requested "other options be considered to insure [sic] that the trust is used most effectively in the service of the citizens and the environment." *Id.* According to MDNR, "[c]ontaining the phosphogypsum pile and treating the seepage together is ultimately the most environmentally-friendly option." *Id.* at 4. MDNR "urge[d]" FIMRT "to consider a long-term solution to achieve actual closure of the pile" and "revisit alternatives to determine whether a more long[-]term solution is feasible." *Id.* at 1. Notably, MNDR informed FIMRT that even if the gypstack is capped, the "[s]eepage will continue to require treatment of some nature to minimize impact on the stream." *Id.*

MDNR provided five options for FIMRT to investigate: "Combination Cap/Whole-Tree Harvest Land Application," "Land Application of Phosphorus Laden Water Without Cap,"

"Combination HDPE Liner with Drip Irrigation," "Combination Cap with Chemical Treatment Plant," and "Chemical Precipitation Treatment Plant with Diversion Ditch Operated for Thirty Years." Pls.' Ex. 22 at 1-3; Def.'s Ex. 61, Attach. 20 at 3 ("Per MDNR's request, [FIMRT] commissioned a feasibility study to evaluate other treatment technologies including 'Engineered Wetland.'"). MDNR informed FIMRT that "[l]ong-term alternatives are few and the cost comparable for long-term chemical treatment as it is for capping and land application." Pls.' Ex. 22 at 4.

In response to MDNR's communication, FIMRT hired Shaw Environmental to evaluate long-term remedial options. *See* Pls.' Ex. 23. Shaw Environmental's report, which is discussed *infra*, section III(G), was provided to MDNR in May 2009. *See id*.

E. **Concerns with Mining Wastes Beneath the Gypstack**

In January 2007, EPA expressed concern about the mining wastes beneath the gypstack. Doc. 125 at 84; Def.'s Ex. 61, Attach. 65. EPA asked MDNR to analyze metals in future samples associated with the gypstack. Def.'s Ex. 61, Attach. 65 at 2. MDNR informed EPA that it wanted to "move towards long term remediation of the [gyp]stack." *Id.* Given FIMRT's "limited funds," MDNR wanted to focus on "a permanent remedy and long[-]term low maintenance treatment system to address the leachate such as an engineered cap and wetlands system." *Id*. EPA indicated "a cost sharing arrangement may be possible to fund the capital cost of the [long-term] remedy" of the gypstack and/or operation and maintenance costs because EPA believed there were "mine tailings" beneath the gypstack. *Id*. But EPA indicated it may be eight to ten years before the Gypstack Site would be addressed due to site priorities. *Id*. at 3.

In February 2007 and November 2007, MDNR and FIMRT, respectively, tested metal concentrations in and around the gypstack. Doc. 125 at 85, 97; Def.'s Ex. 61, Attach. 51. The

investigations revealed elevated concentrations of aluminum, cadmium, zinc, and lead. Doc. 125 at 85-86, 98; Def.'s Ex. 61, Attach. 51 at 13-15. The heavy metals were "associated with mine tailings" predating the creation of the gypstack. Doc. 125 at 83-86, 89-90, 98; Def.'s Ex. 61, Attach. 51 at 7, 15-19. Phosphogypsum itself "would not produce those heavy metals." Doc. 125 at 25.

In 2008, MDNR proposed effluent limits and monitoring requirements for metals, including zinc, nickel, lead, and cadmium to be included in FIMRT's permit. Def.'s Ex. 61, Attach. 43. During meetings with EPA and MDNR, FIMRT was informed it would be "required to treat for all metals." Def.'s Ex. 61, Attach. 30 at 3; *see also* Doc. 125 at 51, 84, 95. FIMRT was also "directed to design the treatment facility to treat these metals." Def.'s Ex. 61, Attach. 30 at 3.

FIMRT objected to being required to address the metals because the metals were not associated with the phosphogypsum. Doc. 125 at 92; Doc. 126 at 34-35; Def.'s Ex. 61, Attach. 37; Def.'s Ex. 61, Attach. 51 at 19; Def.'s Ex. 201A. FIMRT requested MDNR remove effluent limits for metals "since the primary source is mine tailings." Def.'s Ex. 201A at 3. Ostensibly denying FIMRT's request, MDNR began requiring FIMRT to monitor metals in the leachate in 2013, as discussed *infra*, section III(I). Doc. 125 at 95-96, 98, 121; Def.'s Ex. 61, Attach. 41 at 4-20.

## F.     Failed Toxicity Tests

Pursuant to the MDNR-issued permit, FIMRT was required to collect two toxicity tests annually. Doc. 125 at 86-87; Def.'s Ex. 61, Attach. 42 at 7. Toxicity tests were performed in a laboratory with a sample of wastewater discharged from the water treatment plant. Doc. 125 at

86, 88.  Aquatic organisms are exposed to the water to see if they "die as a result of the exposure."  *Id*.  During 2007 and 2008, there were three failed toxicity tests.  *Id*. at 87.

Pursuant to the permit requirements, FIMRT had to conduct more extensive testing because of the failed toxicity tests.  *Id*.  According to the more extensive tests, zinc, which was associated with mining wastes, was responsible for the failed toxicity tests.  *Id*. at 87-89, 98, 124.  The toxicity tests did not indicate phosphorus, fluoride, or any substance associated with phosphogypsum was at an elevation that may kill organisms.  *Id*. at 88-89.

**G.**    **Shaw Environmental's Report**

In May 2009, and in response to MDNR's October 2006 request that FIMRT investigate the feasibility of long-term solutions for the gypstack, FIMRT provided Shaw Environmental's report to MDNR.  Doc. 125 at 89-90; Doc. 126 at 17-18; Pls.' Ex. 23.  The report evaluated the following possible remedial options: cap or cover (precipitation control), concrete-lined channel (surface water control), bentonite slurry wall (groundwater control), and engineered wetland (leachate treatment).  Pls.' Ex. 23 at 10-20.

Shaw Environmental opined construction of a cap or cover was technically feasible, but the cost of materials and transportation, ranging from $4.2 to $8.4 million, rendered a cap or cover cost prohibitive.  Doc. 126 at 18; Pls.' Ex. 23 at 12, 32-35.  It reported a concrete-lined channel, costing between $500,000 and $599,000, was feasible and cost effective.  Pls.' Ex. 23 at 15-16, 36-39.  According to Shaw Environmental, a bentonite slurry wall would cost $39,000 to construct and would be a feasible and cost effective.  *Id*. at 17-18.  Preliminary construction of an engineered wetland would cost between $325,000 and $425,000, but Shaw Environmental noted additional testing was necessary to provide an accurate design criterion.  *Id*. at 20.  Based on its evaluation, Shaw Environmental recommended installation of a bentonite slurry wall and a concrete lined

channel to reduce leachate. *Id.* at 21. It also recommended proceeding with testing for an engineered wetland. *Id.* at 21-22.

## H.     FIMRT's Metals Investigation in 2009

Also in May 2009, FIMRT, in cooperation with MDNR, investigated the surface and ground water near the gypstack to evaluate potential sources of elevated metals in Short Creek, examine phosphorus concentrations, provide data to evaluate proposed permit monitoring requirements, and supply data for evaluation of a constructed wetland. Doc. 125 at 89-90; Def.'s Ex. 61, Attach. 51 at 6-7, 15. The investigation revealed fluoride, phosphorus, arsenic, aluminum, and sulfate are associated with the gypstack. Doc. 125 at 90, 94; Def.'s Ex. 61, Attach. 51 at 19. Cadmium, copper, lead, nickel, and zinc were associated with past mining activities and not the gypstack. Doc. 125 at 83-84, 90, 94; Def.'s Ex. 61, Attach. 51 at 15-17, 19. Iron was related to both the gypstack and the mining activities. Def.'s Ex. 61, Attach. 51 at 19. The report concluded "[t]here is no evidence that the Gypstack has increased the leaching of metals from underlying mine tailings." *Id.*; *see also* Doc. 125 at 91, 94-95.

## I.     Leachate Collection System

To prevent the discharge of metals, phosphorus, and fluoride, FIMRT proposed, and MDNR selected, the construction of a leachate collection system and engineered wetland (hereinafter, "leachate collection system"). Doc. 125 at 96; Doc. 126 at 14-15, 48; Def.'s Ex. 61, Attach. 21 at 4; Def.'s Ex. 61, Attach. 25 at 5. The leachate collection system was an alternative to moving the water treatment plant and constructing additional components to the water treatment plant, which would have been more costly. Doc. 125 at 96; Doc. 126 at 14-15, 48. According to FIMRT, "MDNR decided that constructing a leachate capture system and an engineered wetland

technology was a better and more permanent solution" than relocating the water treatment plant. Def.'s Ex. 61, Attach. 21 at 4; Def.'s Ex. 61, Attach. 22 at 3.

The leachate collection system is a "recirculating system that allows storm water and precipitation to infiltrate through it and then catches the leachate in . . . a series of pipes and trenches at the bottom, collects it in manholes and then pumps it back to a catch basin at the top of the Gypstack." Doc. 125 at 96-97; *see also* Def.'s Ex. 61, Attach. 52 at 4; Def.'s Ex. 61, Attach. 53 at 7. Stated more simply, the leachate collection system captures the leachate and prevents discharge of the leachate into Short Creek. Doc. 125 at 99; Doc. 126 at 14-15. Unlike the water treatment system, which did not address the metals in the mining wastes, the leachate collection system addresses the phosphorus and fluoride from the gypstack and the metals from the mining wastes. Doc. 125 at 26, 78-9, 98-99. The leachate does not leave the system. *Id*. at 97-99.

In November 2011, MDNR approved FIMRT's proposed design for the leachate collection system. Def.'s Ex. 61, Attach. 23 at 4. According to FIMRT, MDNR's "mandated remediation activities . . . consisted of construction of the [l]eachate [c]ollection [s]ystem." Def.'s Ex. 61, Attach. 25 at 5. Construction of the leachate collection system began in January 2012, and the system became operational in April 2012. Doc. 125 at 78-79, 97-98; Def.'s Ex. 61, Attach. 23 at 5; Def.'s Ex. 61, Attach. 24 at 3; Def.'s Ex. 61, Attach. 52 at 3. Beginning in or about July 2013, the system ceased discharge of phosphorus, fluoride, and metals, as MDNR required. Doc. 125 at 97-99; *see also* Def.'s Ex. 61, Attach. 41 at 7. MDNR continued to require FIMRT to monitor phosphorus and fluoride, and it began requiring FIMRT to monitor aluminum, cadmium, lead, and zinc in the leachate. Doc. 125 at 98-99; Def.'s Ex. 61, Attach. 41 at 4-20.

**J.    Mining Wastes Added to the Gypstack**

In May 2011, a tornado struck the southern portion of Joplin, Missouri, destroying roughly 7,000 homes and 3,000 businesses.  Doc. 125 at 100, 118; Pls.' Ex. 15 at 21.  After the destroyed structures and tornado debris were removed, EPA found "significant concentrations of lead, cadmium, and zinc" from mining wastes ("contaminated material") on real property within the ODMB Site.  Pls.' Ex. 21 at 1, 5.  EPA began disposing of the contaminated material in mine subsidence pits and above ground repositories.  *Id*. at 5.

Eventually, EPA ran out of repository space for the contaminated material.  Doc. 125 at 99-100; Pls.' Ex. 15 at 18-19.  The EPA identified the Gypstack Site to place the contaminated material recovered after the tornado.  Pls.' Ex. 15 at 19.  EPA "determined the phospho-gypsum pile, which requires capping to remediate environmental issues associated with the pile, makes an ideal location for a mining wastes repository."  Pls.' Ex. 21 at 5; *see also* Pls.' Ex. 15 at 19. "Mining wastes will be disposed on top of the waste phospho-gypsum prior to capping of the pile in its entirety."  Pls.' Ex. 21 at 5.  And EPA planned "to utilize the [gypstack] as a long-term disposal site for metals contaminated soils excavated from the residential properties in Jasper County as rebuilding occurs."  Doc. 126 at 36-37; Def.'s Ex. 201B at 1.

**(1)    Access Agreement**

In June 2013, EPA and FIMRT executed an Agreement to Allow Access to Property for Environmental Response Action ("Access Agreement").  Doc. 126 at 15-16; Pls.' Ex. 21.  FIMRT granted EPA access to the Gypstack Site to dispose of "[w]astes from the EPA remedial actions and residential soils from the cleanup actions conducted by the [C]ity of Joplin or by private developers and builders . . . ."  Pls.' Ex. 21 at 2, 6.  In addition, FIMRT agreed to keep the Gypstack

Site open for Jasper County builders and developers redeveloping the tornado zone to dispose of contaminated material. *Id.* at 1, 6.

Once the wastes "reach the maximum design height, the repository will be capped with twelve inches of clean clay, followed by six inches of clean topsoil." Doc. 125 at 59; Doc. 126 at 16; Pls.' Ex. 21 at 6; Def.'s Ex. 201B at 1 ("EPA will cover all disposed material with a clean clay and topsoil cap."). EPA also agreed to pursue entry of a judicial consent decree between the United States and FIMRT on "long-term access controls, final closure of the repository and for land use restrictions at the repository area." Pls.' Ex. 21 at 3, 6.[17]

### (2) EPA Amends 2004 ROD

On September 27, 2013, EPA amended its 2004 ROD for the ODMB Site (hereinafter, "ROD Amendment"). Pls.' Ex. 15. According to EPA, the ROD Amendment detailed changes to the 2004 ROD to address "the cleanup of mining and milling wastes, soil and selected sediments contaminated with metals from past mining activities at the [ODMB] Site." *Id.* at 3, 7. The major changes included, among other things, "[i]ncrease in the volume of on-site wastes and the associated increase in cost," "[c]onstruction of aboveground repositories," and "[i]nclusion of contaminated soils in the tornado expedited debris removal . . . area." *Id.* at 3-4. EPA coordinated with MDNR to develop the ROD Amendment, and MDNR concurred with the changes. *Id.* at 7, 25. Relevant here, the ROD Amendment indicated residential properties containing mining wastes

---

[17] Kamyar Manesh, who was FIMRT's Trust Administrator, testified it was the EPA that decided to use the gypstack to deposit mining wastes from other sites generated by the Joplin tornado. Doc. 126 at 16. According to Mr. Manesh, "the agreement all along with the EPA was that they will . . . bring the waste and then they will cap it." *Id.* On cross examination, Mr. Manesh admitted "EPA essentially threatened" FIMRT to "voluntarily" sign the Access Agreement allowing EPA to deposit mining wastes on the gypstack. *Id.* at 37; *see also* Def's Ex. 201B at 2 (indicating EPA "requires access to the property in the very near future," and if the trust is unwilling to sign the Access Agreement, "EPA is prepared to exercise additional administrative method[s] to gain access, which may include but not limited to a Unilateral Administrative Order.").

"will be disposed of at the Gypstack." *Id*. at 21, 26; *see also* Doc. 126 at 15-16.  And the addition of mining wastes would raise the gypstack's elevation up to thirty feet.  Pls.' Ex. 15 at 19.

The gypstack, according to EPA, requires "remediation."  *Id*.  According to the ROD Amendment, "MDNR has undertaken oversight of certain activities for the Gypstack," including the issuance of a permit "for zero discharge and requires collection and recirculation of leachate." *Id*.  EPA stated "the remedial action for the Gypstack must be in accordance with the engineering control components for the [Operable Unit 1 of the ODMB Site] selected remedial action for capping of repositories."  *Id*.  "This will include a geocomposite engineered cap with long-term [operation and maintenance]."  *Id*. at 19, 26.  EPA further stated "[c]apping of the Gypstack, mining wastes and contaminated yard soils will include a geocomposite engineered cover layer, which will be completed as the top of the Gypstack reaches maximum design elevation."  *Id*.; *see also* Doc. 125 at 20, 59-60, 114-16, 121-22; Doc. 126 at 16.

Due to the increased waste volume, number of aboveground repositories, and excavation costs, EPA estimated the costs for remediating the mining wastes was $168 million.  Pls.' Ex. 15. at 22.  According to the ROD Amendment, "the costs will increase by $20 million due to the remediation of mine wastes and associated soils" placed on the gypstack.  *Id*.

**(3)    EPA's Addition to the Gypstack Site**

In 2014, EPA began placing contaminated material on top of the Gypstack Site.  Doc. 125 at 59, 99-100, 118-19; Def.'s Ex. 61, Attach. 13 at 1.  By early 2015, mining wastes "effectively covered the top of the gypstack."  Doc. 126 at 41; Def.'s Ex. 201E at 1; *see also* Def.'s Ex. 61, Attach. 7 at 2.  And by early 2016, roughly two to six feet of mining wastes and contaminated soil covered the top of the gypstack.  Def.'s Ex. 61, Attach. 13 at 1.

EPA's deposit of contaminated material on the gypstack increased the concentration of mine-related contaminants. Doc. 125 at 82; Doc. 126 at 42-43, 45-46; Def.'s Ex. 201E at 1 (noting "a spike in the cadmium and zinc concentrations" in July 2019), 3, 10, 12. The addition of contaminated material also reduced the infiltration of storm water through the gypstack. Doc. 125 at 100-01; Doc. 126 at 39-40, 44; Def.'s Ex. 201D at 3; Def.'s Ex. 201E at 2. And it created storm water management issues, including material washouts, that FIMRT had to address. Doc. 125 at 100-01; Def.'s Ex. 61, Attach. 26 at 4-5. Further, the additional mining wastes increased the storm water flow, which caused erosions. Doc. 125 at 101. FIMRT was required to fix the erosions. *Id*.

In addition, sediment from the mining wastes placed by EPA clogged a catch basin, which had to be replaced with a different drainage system. Doc. 125 at 102-03, 106-07; Def.'s Ex. 61, Attach. 26 at 4. FIMRT incurred roughly $22,000 to clean out the catch basin and dispose of the wastes. Doc. 125 at 122, 125. Further, sink holes formed, damaging some of the lateral lines pumping the leachate from the manholes to the recirculation portion of the gypstack. Doc. 125 at 102; Def.'s Ex. 61, Attach. 26 at 5.

In June 2020, EPA anticipated placing another 420,000 cubic yards of mining wastes on the gypstack over the next three to five years. Def.'s Ex. 61, Attach. 8 at 2. The additional contaminated material would bring the gypstack repository capacity to its allowable limits. *Id*. Upon the gypstack reaching its capacity, EPA and MDNR envisioned construction of a clay cover, topsoil vegetative layer, vegetation, and management of surface water and leachate. *Id*. As of August 2022, EPA and MDNR were "working with" and "in discussions with" SCD to "determine next steps on capping and closing the repository," "complete stabilization of the repository cap," and "complete the final cover" at the Gypstack Site. Def.'s Ex. 61, Attach. 57 at 11, 21. As of the

December 2023 bench trial, construction of the cap had not yet started.  Doc. 125 at 60; Doc. 126 at 217.[18]  And it is unknown as to when construction may begin.  Doc. 126 at 55.

## K.  Administrative Settlement and Order on Consent

Pursuant to the Access Agreement in which EPA agreed to pursue a judicial consent decree on "long-term access controls, final closure of the repository and for land use restrictions at the" Gypstack Site, an Administrative Settlement and Order on Consent for Treatability Study ("Order on Consent") was entered and became effective on March 8, 2016.[19]  Pls.' Ex. 21 at 3, 6; Def.'s Ex. 61, Attach. 64.[20]  EPA's and FIMRT's "objectives" in entering the Order on Consent were to "protect public health or welfare or the environment at the [Gypstack Site][21] by the design of response actions" by FIMRT, "reimburse response costs of EPA," and "resolve the claims of EPA against [FIMRT] as provided in this Settlement Agreement."  Def.'s Ex. 61, Attach. 64 at 5.

The Order on Consent declared "EPA selected a remedial action" for the ODMB Site and the Gypstack Site when it entered the ROD Amendment.  *Id*. at 9.[22]  The "selected remedial action is to contain the mining wastes and Gypstack repository at [FIMRT's] Property, install an engineered cap and control run-off and leachate."  *Id*. at 10.  According to the Order on Consent, EPA coordinated selection of the remedial action with the State of Missouri, which concurred with the selected remedy.  *Id*. at 5, 99.

---

[18] MDNR and the City of Joplin also placed contaminated material on the gypstack.  Def.'s Ex. 201E at 2; Def.'s Ex. 61, Attach. 8 at 5.  MDNR placed "[l]imited quantities of mine waste . . . through 2014," but it had "little influence on the hydraulics of the gypstack as a whole."  Def.'s Ex. 201E at 2.  The parties do not provide, and the record does not indicate, how much contaminated material the City of Joplin placed on the gypstack.

[19] The Order on Consent was deemed effective when EPA signed it, which was March 8, 2016.  Def.'s Ex. 61, Attach. 64 at 43, 46.

[20] The agreement applies to and is binding on FIMRT's successors and assigns.  *Id*. at 6.

[21] "Property" is defined as the real property containing the gypstack.  *Id*. at 8-9.

[22] In the Order on Consent, "ROD" refers to the ROD Amendment.  *Id.* at 8.

Pursuant to the parties' agreement, FIMRT agreed to undertake a treatability study. *Id*. at 4, 14-17, 49-55. EPA agreed to use the treatability study to design the selected remedial action. *Id*. at 4. In addition, FIMRT agreed to, *inter alia*, (1) provide EPA and others with access to the Gypstack Site; (2) not sue or assert claims against the United States under CERLCA with regard to past and future response costs; and (3) pay $4,000 to the Hazardous Substance Superfund "for Future Response Costs to be incurred by EPA."[23] *Id*. at 14-15, 21, 25, 36. Per the Order on Consent, FIMRT "resolved liability to the United States" under sections 113(f)(2), 113(f)(3)(B), and 122(h)(4) of CERCLA and is entitled to protection from CERCLA contribution actions or claims. *Id*. at 39-40. In return, EPA agreed not to take action against FIMRT pursuant to sections 106 and 107(a) of CERCLA for work FIMRT performed "under this Settlement Agreement and Future Response Costs." *Id*. at 33.

## L.     Treatability/Feasibility Work Plan

At the direction of MDNR and EPA, FIMRT hired CB&I, formerly known as Shaw Environmental, "to prepare a treatability/feasibility work plan for long term management of leachate" from the Gypstack Site. Def.'s Ex. 61, Attach. 13. In January 2016, CB&I issued its report. *Id*. According to CB&I, "The critical component for the selection of a final remedy is based on the sustainable flow from the leachate collection system." *Id*. at 1. It suggested a dye trace test to determine, among other things, if the leachate discharged to the catch basin recirculated back into the leachate collection system. *Id*. at 2. Further, it stated "following completion of the dye test, long[-]term leachate tre[at]ability alternatives will be evaluated to manage leachate emanating from the Gypstack." *Id*. at 6.

---

[23] The $4,000 "lump sum payment" for "Future Response Costs" "is for all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing plans, reports and other deliverables pursuant to this Settlement Agreement, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement . . . ." Def.'s Ex. 61, Attach. 64 at 7.

MDNR and/or EPA approved CB&I's work plan for the dye testing. Def.'s Ex. 61, Attach. 14 at 1. In January 2017, CB&I provided its test results to MDNR and EPA. *Id*. at 1. CB&I found the "[i]nflow of water into the Gypstack remains to be a significant contributor of the generation of leachate." *Id*. at 5. It identified the inflow pathways as direct precipitation, surface water runoff, and shallow groundwater. *Id*. CB&I observed "inflow from direct precipitation will be managed through the ongoing placement of impacted soil on the surface of the Gypstack and the eventual construction of an engineered cap." *Id*. Regarding surface water and groundwater, CB&I recommended diverting surface water runoff by improving the existing storm water diversion ditch and diverting groundwater flow by constructing a French drain system. *Id*. at 5-6.

**M.     Construction of Interceptor Trench**

To comply with the Order on Consent, FIMRT constructed an interceptor trench. Def.'s Ex. 61, Attach. 26 at 3. In April 2017, the contractor began excavating areas near the gypstack. *Id*. But the contractor encountered "[v]ery high inflow of groundwater," and "efforts to dewater the excavation were unsuccessful." *Id*. After being informed of the site conditions, EPA and MNDR "decided to abandon the trench excavation." *Id*. The contractor backfilled the trench. *Id*.

**N.     SCD's Purchase of the Gypstack Site and Permit Modification**

In July 2021, SCD purchased the Gypstack Site for $1.00 from FIMRT. Def.'s Ex. 26 at 2.[24] SCD also agreed to assume all environmental liabilities and administrative expenses associated with the Gypstack Site. *Id*. at 3. SCD collateralized and secured its environmental liabilities by placing the residual cash balance of FIMRT's corpus in escrow. Def.'s Ex. 152.

---

[24] Between 2006 and 2018, FIMRT valued the Gypstack Site at $100,000 in its annual valuation reports. *See* Def.'s Ex. 61, Attach. 27 at 1-2 (2006); Def.'s Ex. 61, Attach. 20 at 1-2 (2009); Def.'s Ex. 61, Attach. 21 at 2-3 (2010); Def.'s Ex. 61, Attach. 22 at 1-2 (2011); Def.'s Ex. 61, Attach. 23 at 2-3 (2012); Def.'s Ex. 61, Attach. 24 at 2-3 (2013); Def.'s Ex. 61, Attach. 25 at 3 (2014); Def.'s Ex. 61, Attach. 26 at 2-3 (2018).

At the time of the sale, FIMRT's corpus remained at $1,580,651.29. Doc. 85 at 4. According to FIMRT's Trust Administrator, the corpus contained a little more than $1,000,000 for remediation costs, and about $600,000 for administrative costs. Doc. 126 at 52-53. When FIMRT terminated at the end of 2021, there were no outstanding invoices. *Id*. at 26. Further, all response costs have been paid from FIMRT's corpus. Doc. 125 at 40-41.

In September 2021, FIMRT and SCD asked MDNR to transfer the permit from FIMRT to SCD. Def.'s Ex. 61, Attach. 40 at 25-27. In November 2021, MDNR modified the permit, reflecting SCD as the Gypstack Site's owner. *Id.* at 1. The modified permit maintains a "no discharge" system and continues monitoring requirements for, among other things, phosphorus, fluoride, aluminum, cadmium, lead, selenium, and zinc. *Id*. at 1-2, 17.

## IV. DISCUSSION

To establish liability under CERCLA, a plaintiff must show (1) the site is a "facility," (2) a release or "threatened release" of a "hazardous substance" from the site occurred, (3) the release or threatened release caused the plaintiff to incur response costs, and (4) the defendant falls within at least one of four classes of responsible persons. *United States v. Aceto Agr. Chems. Corp*., 872 F.2d 1373, 1378-79 (8th Cir. 1989) (citations omitted); 42 U.S.C. § 9607(a). Previously, the parties stipulated the Gypstack Site is a facility, there has been a release or threatened release of a hazardous substance at the Gypstack Site, SCD incurred response costs, and Defendant falls within at least one class of responsible persons. Doc. 85 at 4-5. Based on the parties' stipulations, Defendant is liable to Plaintiffs under section 107(a) of CERCLA. After conducting a bench trial on the issue of whether the environmental harm was divisible, the Court concluded Defendant is jointly and severally liable under CERCLA. Doc. 118.

The applicable statute of limitations for a party seeking recovery of costs under section 107(a) of CERCLA depends on whether the response action is a "removal action" or "remedial action." 42 U.S.C. § 9613(g)(2). Removal actions are "taken to counter imminent and substantial threats to public health and welfare." *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 608 (8th Cir. 2011) (quoting *Minn. v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1024 (8th Cir. 1998)). Remedial actions "are longer term, more permanent responses." *Id.*

The parties agree the responses at the Gypstack Site are "remedial actions." Doc. 128 at 5-10; Doc. 129 at 10-11. They also agree an initial action for recovery of costs associated with a remedial action must be brought "within 6 years after initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B); Doc. 128 at 3; Doc. 129 at 12.[25] The parties, however, disagree as to when "physical on-site construction of the remedial action" began or will begin. Plaintiffs argue "the remedial action for the Site calls for the construction of a permanent cap," and until construction commences on the future cap, the statute of limitations is not triggered. Doc. 129 at 12-13. Defendant contends the water treatment plant and the leachate collection system are remedial actions, and because construction of those actions commenced more than six years before Plaintiffs filed this matter, the statute of limitations has run. Doc. 128 at 6-10.[26]

The parties' arguments depend on the interpretation of what constitutes "initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B). Unfortunately, CERCLA does not define this phrase. But the statute defines "remedial action," which is where the Court begins its analysis.

---

[25] The parties also agree this matter is an "initial action" under CERCLA. Doc. 128 at 10-11; Doc. 129 at 13-15.

[26] The Court notes Defendant's Answer asserts statute of limitations as an affirmative defense. Doc. 29 at 17.

CERCLA defines "remedy" or "remedial action" as follows:

[T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(24). The statute further defines remedial action as follows:

The term includes, but is not limited to, such actions at the location of the release as *storage*, *confinement*, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, *collection of leachate and runoff*, *onsite treatment* or incineration, provision of alternative water supplies, and *any monitoring reasonably required* to assure that such actions protect the public health and welfare and the environment.

*Id*. (emphasis added). While the parties agree the actions taken at the Gypstack Site are remedial, the Court briefly summarizes the actions that have occurred. It will then turn to the future remedial action of capping the Gypstack Site and the triggering of the statute of limitations.

## A.     Water Treatment Plant (2000 through 2012)

Beginning in 1995, MDNR required Farmland to regulate limitations for phosphorus and fluoride in the leachate from the Gypstack Site. To achieve MDNR's permit requirements, Farmland proposed construction of a water treatment plant and rerouting Short Creek. MDNR approved a modified compliance plan as well as Farmland's plans and specifications for constructing the plant.

Although it is unclear when construction began, the record reflects the water treatment plant began operating in 2000. The plant removed phosphorus and fluoride from the leachate. In doing so, the water treatment plant provided "onsite treatment" and prevented phosphorus and fluoride from migrating "to cause substantial danger to present or future public health or welfare or the environment." *See* 42 U.S.C. § 9601(24). Thus, the water treatment plant falls within the

definition of remedial action. 42 U.S.C. § 9601(24); *see also Vill. of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 780 n.4 (7th Cir. 2008) (observing a water treatment plant is a remedial action); *United States v. Conservation Chem. Co.*, 628 F. Supp. 391, 408 (W.D. Mo. 1985) (same).[27]

Nothing in the record indicates MDNR or EPA communicated with Farmland for several years about additional necessary actions at the Gypstack Site. In fact, in February 2001, Farmland reported it had taken "all necessary response actions mandated by the MDNR," and no further action was necessary regarding the Gypstack Site. Moreover, the water treatment plant continued to operate until March 2012, after which the leachate collection system became operational.

It was not until September 2006 – six years after the water treatment plant became operational – that MDNR instructed FIMRT to investigate "a long-term solution to achieve actual closure of the" Gypstack Site. MDNR maintained "the most environmentally-friendly option" was "[c]ontaining the phosphogypsum pile and treating the seepage together." MDNR provided five options for FIMRT to investigate, including capping. But MDNR acknowledged if the gypstack was capped, "[s]eepage [would] continue to require treatment." Thus, according to MDNR, a cap could not be the sole remedial action.[28]

## B. Leachate Collection System (January 2012 through Present)

In 2009, FIMRT, as instructed by MDNR, provided a report of its investigatory findings on MDNR's suggested long-term solutions, including capping the Gypstack Site. Of the potential solutions investigated, MDNR chose the leachate collection system. Construction began in

---

[27] Along with the water treatment plant, Farmland constructed a trench, low water dam, 59,000-gallon tank, lagoon, and drain. These actions prevented or minimized the release of phosphorus and fluoride, and thus, were remedial. *See Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 609 (8th Cir. 2011) (finding "shutting down contaminated wells and providing alternative water sources to prevent . . . residents from drawing and using contaminated water does 'prevent or minimize the release of hazardous substances' to protect the public health and welfare.").

[28] In 2007, MDNR and EPA discussed the possibility of capping the Gypstack Site. Although MDNR was concerned about FIMRT's "limited funds," EPA indicated cost sharing may be available to fund the cap since "mine tailings" were believed to be "located beneath the stack."

January 2012, and the leachate collection system became operational in April 2012. The leachate collection system, which continues to operate to this day, collects water, confines the leachate, and prevents the discharge of phosphorus, fluoride, and metals into Short Creek.

CERCLA's definition of "remedial action" specifically includes "collection of leachate." 42 U.S.C. § 9601(24). In addition, the leachate collection system was designed to confine the leachate and "prevent or minimize the release of hazardous waste." *Id*. Further, MDNR required FIMRT to monitor certain substances to protect the public health and welfare and the environment. *Id*. For these reasons, the leachate collection system falls within the statutory definition of remedial action.

**C.       Capping the Gypstack (Future Date Unknown)**

According to Plaintiffs, the Access Agreement and ROD Amendment establish the "remedial action" is "construction of a permanent cap." Doc. 129 at 12 (citing Pls.' Exs. 15, 21). More than eleven years have passed since EPA and FIMRT executed the Access Agreement, and more than ten years have passed since EPA issued the ROD Amendment. But, through the date of trial, construction of the cap had not begun. And it is unknown when construction will begin.

Although a permanent cap meets one of the definitions of "remedial action" under 42 U.S.C. § 9601(24), that does not mean the other measures previously constructed at the Gypstack Site, including the water treatment plant and the leachate collection system, do not also constitute "remedial actions." Those measures are also specifically included in the statutory definition of "remedial action." And tellingly, nothing in section 9601(24) suggests there can only be one "final remedy" as Plaintiff contends. *See* 42 U.S.C. § 9601(24) (defining "remedy" or "remedial action" in the plural as "those actions consistent with permanent remedy" to "prevent or minimize the release of hazardous substances").

**D.    Cases Cited by Plaintiffs**

Plaintiffs contend that until construction of the permanent cap begins, the statute of limitations has not been triggered.  Doc. 129 at 12-13.[29]  In support, Plaintiffs cite four cases.  *Id*. These cases discuss initiation of on-site construction, consistency with permanent remedy, and a bright-line rule adopted by at least one court.

**(1)    Initiation of On-Site Construction**

First, Plaintiffs cite *United States v. Findett Corp.*, 220 F.3d 842 (8th Cir. 2000), to support their argument that "sampling, surveying, evaluation and measuring" cannot constitute physical on-site construction.  Doc. 129 at 12 (citation omitted).  Defendant does not seem to dispute this contention.  *See* Doc. 128.  Moreover, it is undisputed the water treatment plant and leachate collection system did not simply sample, survey, evaluate, and measure the leachate's components. *See supra*, sections III(B), III(I), IV(A), IV(B).  Instead, these systems collected, confined, and/or treated the leachate.  *See id*.

Although the parties agree the response actions at the Gypstack Site are remedial, the Court examines *Findett*.  In *Findett*, the Eighth Circuit was tasked with determining whether "[v]isits to the site," "taking of soil and water samples, engineering surveys, and the determination of the size and location of the support pad for an air stripper" constituted physical on-site construction.  220 F.3d at 848.  The Eighth Circuit found these actions did not constitute "construction" when given the term its "ordinary meaning."  *Id*.  Instead, the Court determined the activities related to "testing, monitoring, or design of the remedy" and "were preliminary to the start of construction."  *Id*.

---

[29] Plaintiffs' argument that the future permanent cap is the triggering event for the commencement of the statute of limitations is rather perplexing given the remedies they seek in this case are for past costs incurred for remedial measures prior to June 30, 2023 (*see* Doc. 127 at 2), which are unrelated to the future costs for the cap.  Further, it does not appear Plaintiffs will incur the future costs related to the permanent cap as the EPA agreed to cover all disposed waste materials from the tornado placed on top of the gypstack with a clean clay and topsoil cap.  *See* Doc. 125 at 59; Doc. 126 at 16; Pls.' Ex. 21 at 6; Def.'s Ex. 201B at 1.

Unlike the facts in *Findett*, the actions in this matter do not consist of "testing, monitoring, or design of remedy," and they were not "preliminary to the start of construction." The water treatment plant and leachate collection system were remedial actions approved by MDNR that collected, confined, and/or treated the leachate. *See supra*, sections III(B), III(I). Further, there is nothing in the record indicating either action was required before the gypstack could be capped.

In addition to the foregoing, *Findett* differs from this matter in other ways. The *Findett* litigation was brought by the United States, and as the Eighth Circuit noted, "[s]tatutes of limitation sought to be applied to bar rights of the Government[ ] must receive a strict construction in favor of the Government." 220 F.3d at 848 (quoting *Badaracco v. Comm'r of Internal Revenue*, 464 U.S. 386, 391 (1984)). In addition, although EPA issued the ROD with the site's remedial plan several years before the lawsuit was filed in *Findett*, the Eighth Circuit did not indicate the ROD was a prerequisite to on-site construction beginning or impacted when the statute of limitations began to run. *See id*. at 844, 847-48. Finally, it does not appear any response actions were taken at the site until after EPA issued its ROD. *See id*. at 844-48. At the Gypstack Site, response actions began more than thirteen years before the ROD Amendment was issued. And the response actions, including the water treatment plant and leachate collection system, were all selected and/or approved by MDNR and fit the statutory definition of remedial action under CERCLA.

**(2)      Consistent with Permanent Remedy**

Next, Plaintiffs maintain "for the remedial action to begin, the work must be consistent with the permanent remedy." Doc. 129 at 12. In support, they cite cases from the Fifth and Seventh Circuits. *Id*. (citation omitted). Plaintiffs do not expressly argue the water treatment plant and the leachate collection system are inconsistent with "construction of a permanent cap." *See* Doc. 129 at 12-13. Nonetheless, the Court presumes Plaintiffs assert such an argument.

Plaintiffs' reliance on the definition of "remedial action" contradicts any suggestion the water treatment plant and leachate collection system are not "consistent with permanent remedy." That is, they represent remedial actions are "those actions consistent with permanent remedy" (*Id.* at 10-11), but the statutory definition of remedial actions includes storage, confinement, collection of leachate and runoff, onsite treatment, and monitoring. 42 U.S.C. § 9601(24). Both the water treatment plant and the leachate collection system not only collected the leachate, but they also confined and/or treated the leachate, prevented the discharge of hazardous substances into the environment, and MDNR also requires monitoring. *See supra*, sections III(B), III(I).

Despite the foregoing, the Court assesses the Fifth Circuit and Seventh Circuit cases cited by Plaintiffs. In *Geraghty & Miller v. Conoco Inc.*, the Fifth Circuit was faced with determining if a response action constituted a removal action or remedial action. 234 F.3d 917 (5th Cir. 2000).[30] For this reason alone, the Fifth Circuit case differs from this matter where the parties concede the response activities at the Gypstack Site are remedial actions.[31] Even if the Court were to look beyond this fundamental difference, *Geraghty & Miller* differs from this matter in other respects.

By way of background, in *Geraghty & Miller*, a state agency ordered Conoco Inc. to investigate and address ethylene dichloride contamination, which included implementing a groundwater monitoring and assessment program. *Id.* at 920-21. Conoco contracted with Geraghty & Miller ("G&M") to design and install wells to monitor and assess groundwater. *Id.* After the wells were installed, Conoco suspected deficiencies with the wells' construction. *Id.* at

---

[30] Although not noted by Plaintiffs, the Fifth Circuit abrogated in part *Geraghty & Miller*. *See Vine St. LLC v. Borg Warner Corp.*, 776 F.3d 312, 317 (5th Cir. 2015) (citation omitted) (stating "*Geraghty & Miller* is no longer controlling authority" regarding a plaintiff's burden of proof in establishing arranger liability).

[31] In addition, *Geraghty & Miller* involved a contribution claim under section 113 of CERCLA. *Geraghty & Miller*, 234 F.3d at 932-25. The matter before this Court involves a cost recovery action under section 107 of CERCLA.

921.  Eventually, the wells were plugged, abandoned, and replaced.  *Id*. at 921-22.  Conoco later

sought contribution from G&M.  *Id*. at 922-25.

The Fifth Circuit determined G&M's actions were removal actions, not remedial actions,

under CERCLA.  *Id*. at 926-27.  In reaching this decision, the Fifth Circuit found G&M's actions

– designing and installing wells – assessed conditions "to determine the extent of contaminants"

and "investigate water quality."  *Id*. at 926.  The Court also noted, "[a]t the time, G&M apparently

did not consider its work to include any remediation efforts, and only considered it a possibility

that its work would be part of a recovery effort."  *Id*. at 927.  The Fifth Circuit observed the state

agency "had yet to issue its final decision, and only that decision will define the ultimate remedial

strategy for the" site.  *Id*.  But the fact that a decision as to the ultimate remedial strategy had not

been issued was not surprising because it was not until <u>after</u> G&M installed the wells that "a

feasibility study of remedial alternatives" would be conducted.  *See id.* at 926.

Here, this Court is not faced with actions to investigate the extent of the environmental

harm.  Instead, the response actions collected, confined, and/or treated the leachate and prevented

the release of hazardous substances into the environment.  And, unlike *Geraghty & Miller*, MDNR

directed FIMRT to conduct a feasibility study of remedial alternatives, after which MDNR chose

to have a leachate collection system installed, approved the design for the system, and modified

the permit.  *See supra*, sections III(D), III(G), III(I).[32]  The agency-approved leachate collection

system became operational in 2012 and, at the time of trial in this matter, continued to operate.

---

[32] In *Geraghty & Miller*, Conoco argued the statute of limitations did not begin to run until entry of a judgment,
administrative order, or judicially approved settlement.  234 F.3d at 923-25.  The Fifth Circuit rejected this argument
stating "the statute of limitations would be indefinite because a triggering event might never occur.  This result would
undermine the certainty that statutes of limitations are designed to further."  *Id*. at 925.  Here, Plaintiffs contend the
statute of limitations is not triggered until on-site construction of the cap begins.  Doc. 129 at 12-13.  Construction of
the cap has not begun, and there is no indication as to when it will begin.  Thus, it is possible Plaintiffs' proposed
triggering event may never occur.  And it appears the future cap remains subject to the discretion of EPA, which
fundamentally changed the nature of the gypstack and the resulting environmental concerns when it decided to use
the site to deposit mining wastes related to the Joplin tornado.

Plaintiffs also cite *United States v. Navistar International Transportation Corp.*, 152 F.3d 702 (7th Cir. 1998), to support their argument that "for remedial action to begin, the work must be consistent with the permanent remedy." Doc. 129 at 12. In *Navistar*, EPA determined a hazardous waste site "needed to be covered with a permanent clay cap to isolate the hazardous materials from the rest of the environment." 152 F.3d at 704. A suit was filed against the site's owner and operator, and the parties sought and obtained a consent decree. *Id*. After the cap was constructed, the United States filed suit against Navistar and others to recover costs for the remedial action not covered by the consent decree. *Id*. at 705.

The question before the Seventh Circuit was when physical on-site construction of the remedial action occurred. *Id*. at 706-13. The Court found "placement of clay" on the site was the "first step in constructing the permanent clay cap." *Id*. at 713. Although the initial clay placed on the site was later "deemed inadequate to satisfy certain specifications required for the clay cap," the Seventh Circuit found this fact irrelevant because the statute focuses on initiation, not completion, of construction. *Id*. Because the action against Navistar was filed more than six years after the clay was placed on the site, the Seventh Circuit found the matter was barred by the applicable statute of limitations. *Id*.

*Navistar* presents a different situation than the matter before this Court. In *Navistar*, there was no indication that other response actions occurred at the site before EPA determined the site needed to be capped. *See id*. at 703-05. Here, response measures, which met the statutory definition of remedial actions, occurred for more than a decade before EPA and FIMRT executed the Access Agreement or EPA issued the ROD Amendment, which included a permanent cap for the site. Further, unlike the placement of clay on the site in *Navistar*, no materials for the cap have

been placed at the Gypstack Site, and there is no indication as to when materials for the cap will be placed in the future.

### (3)    Bright-Line Rule

Finally, Plaintiffs represent the Ninth Circuit adopted a bright-line rule that "initiation of physical on-site construction can only occur after the adoption of the final remedial action plan." Doc. 129 at 12 (citing *Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 667 (9th Cir. 2004)). According to the Ninth Circuit, an action cannot be "consistent with permanent remedy" unless a permanent remedy has already been adopted. 358 F.3d at 667 ("The first point at which both parties can be certain that any construction is consistent with a permanent remedy is when the permanent remedy is actually selected."). Plaintiffs do not explicitly ask, nor does it appear they are suggesting, this Court to follow the Ninth Circuit's rule. *See* Doc. 129 at 12-13.

Nevertheless, at least two appellate courts have determined adoption of a permanent remedy is not required for the statute of limitations to be triggered. In *Navistar*, the Seventh Circuit rejected such a rule. 152 F.3d at 711-13. According to the Court, "The statute is devoid of any reference that would lead us to conclude from its plain language that Congress intended to incorporate this specific aspect of the administrative process in establishing the actions that would trigger the limitations period." *Id*. at 712. "Rather, in crafting the statute of limitations, Congress specifically made 'the initiation of physical on-site construction of the remedial action' the triggering event." *Id*. "If [Congress] had intended to require that the EPA issue its final approval of the remedial design in order for a 'remedial action' to begin within the meaning of § 9613(g)(2)(B)-a contention unsupported by the [statutory] definition of 'remedial action'-

33

Congress surely would have provided us with a more explicit direction to that effect." *Id.* (citation omitted).

The Second Circuit also rejected physical on-site construction consistent with final remedy can only occur with approval of a final remedial action plan. *Schaefer v. Town of Victor*, 457 F.3d 188, 207 (2d Cir. 2006). The Second Circuit found such a requirement "is in tension with the plain language of the statute," which does not mention anything about approval of a final remedy. *Id.* at 207. The statute only requires the work be consistent with the permanent remedy. *Id.* The Second Circuit further noted if approval of a final remedy was required for the statute of limitations to begin running, the terms "remedial action" and "removal action" would have been defined "as all response activities which occur after final approval of the permanent plan." *Id.* at 208. And if the statute of limitations did not begin to run until after the final remedy was approved, the Second Circuit observed the "lengthy statutory definitions in CERCLA of removal and remedial action would be rendered meaningless." *Id.* at 208 (citation omitted). Both the Second Circuit and Seventh Circuit do "not think Congress intended such an inconsistency when it drafted the statute of limitations provision." *Id.*

As best the Court can discern, the Eighth Circuit has not been asked to address the specific statute of limitations issue before this Court. But the Eighth Circuit, in deciding whether a lawsuit constituted an initial or subsequent action under section 113(g)(2) of CERCLA, "decline[d] to adopt a definition of subsequent action that would discourage the timely filing of cost-recovery actions." *Morrison Enters.*, 638 F.3d at 610 (quoting *Navistar*, 152 F.3d at 707 & n.7). The Court noted that to conclude otherwise would "frustrate Congress's intent 'to assure that evidence concerning liability and response costs i[s] fresh . . . and to provide some measure of finality to affected responsible parties.'" *Id.* As stated by the Supreme Court, statutes of limitations "foster

the elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 14 (2014) (internal quotation and citation omitted).

Plaintiffs contend the statute of limitations is not triggered until the construction of the cap on the gypstack begins, but it remains unknown as to when the cap will be built. Further, it appears from the evidence that the permanent cap was part of the process used by EPA to find a location to deposit additional hazardous wastes generated from the Joplin tornado. The timing for a permanent cap remains speculative at this time. Thus, there is no certainty as to when the statute of limitations may begin to run under Plaintiffs' theory.

If the Court were to adopt Plaintiffs' argument that the future construction of the cap is the triggering event for their claim against Defendant, such a determination would provide no certainty or accuracy and would contradict the general purpose of statutes of limitations. *See Motley v. United States*, 295 F.3d 820, 824 (8th Cir. 2002) (observing "statutes of limitations protect important interests of certainty, accuracy, and repose") (citation omitted). Further, evidence concerning liability and costs would grow stale, and the measure of finality for Defendant would be indefinite. *See Lozano*, 572 U.S. at 14; *Morrison Enters.*, 638 F.3d at 610.

**E.    The Leachate Collection System is Consistent with Permanent Remedy**

The record demonstrates MDNR, the lead agency for the Gypstack Site, issued permits and regulated the response actions beginning in 1995. *See supra*, section III(B). In or about 2000, MDNR approved the water treatment plant. *See id.* In 2004, FIMRT was formed and funded to implement actions required by MDNR, FIMRT's primary beneficiary, to remediate and monitor the Gypstack Site. *See supra*, section III(C). MDNR directed FIMRT to investigate long-term solutions, including capping, to achieve closure of the Gypstack Site. *See supra*, section III(D).

After FIMRT conducted a feasibility study, MDNR chose and approved the leachate collection system.[33]  *See supra*, sections III(G), III(I).

Plaintiffs have not presented evidence demonstrating the leachate collection system is not "consistent with permanent remedy."  42 U.S.C. § 9601(24).  According to the Order on Consent, the permanent remedy "is to contain the mining wastes and Gypstack repository at [Plaintiffs'] Property, install an engineered cap and control run-off and leachate."  Def.'s Ex. 61, Attach. 64 at 10.  The permanent remedy requires the run-off and leachate to be controlled.  *Id.*

The leachate collection system controls the run-off and leachate, contains the leachate, and prevents the leachate (containing phosphorus, fluoride, and metals) from discharging into Short Creek.  *See supra*, section III(I).  Furthermore, no evidence was presented suggesting the leachate collection system will not be utilized or will be dismantled once the Gypstack Site is capped.  *See GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 444-45 (6th Cir. 2004) (holding a remedial action is not consistent with permanent remedy if the permanent remedy requires dismantling the prior work at the site).  Accordingly, the leachate collection system is consistent with the permanent remedy.  For these reasons, the Court finds the leachate collection system is consistent with the permanent remedy and is specifically listed as a remedial action under section 9601(24) of CERCLA.[34]

Physical onsite construction of the leachate collection system began in January 2012.  At that time, the six-year statute of limitations began to run.  Plaintiffs, however, waited until March 28, 2022, to file their claim under section 107(a) of CERCLA.  Doc. 1.  Because Plaintiffs filed

---

[33] EPA's involvement at the Gypstack Site has been limited.  It was not until 2007 that EPA expressed an issue related the Gypstack Site – specifically, the mining wastes under the Gypstack Site.  At that time, EPA requested MDNR analyze metals at the Gypstack Site, and both MDNR and FIMRT investigated the metals.  The record indicates EPA was not directly involved with the Gypstack Site again until 2013, when EPA began running out of repository space for contaminated material from the Joplin tornado.  *See supra*, section III(J).

[34] Because the Court finds the leachate collection system is consistent with permanent remedy, it is unnecessary for the Court to determine whether the water treatment plant is also consistent with permanent remedy.

their complaint more than six years after the initiation of onsite construction of the leachate collection system, their claim is untimely.

## V.     CONCLUSION

In accordance with the foregoing discussion, the Court finds Plaintiffs' claim against Defendant under section 107(a) of CERCLA is barred by the statute of limitations.  Therefore, the Court enters judgment in Defendant's favor on Plaintiffs' claim.

**IT IS SO ORDERED.**

DATE: September 27, 2024                    *   /s/ W. Brian Gaddy*
                                             W. BRIAN GADDY
                                             UNITED STATES MAGISTRATE JUDGE